2004 WY 144

STATE of Wyoming, ex rel., **WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION,** Appellant (Petitioner),

v.

Michael W. **PARRISH,** Appellee (Claimant/Respondent).

No. 03–189.

Supreme Court of Wyoming.

Nov. 19, 2004.

Representing Appellant: Patrick J. Crank, Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; and Alora L. Kempster, Special Assistant Attorney General.

Representing Appellee: Roger E. Shumate and Paul R. Flick of Murane & Bostwick, Casper, WY.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1]   The Wyoming Workers' Compensation Division (Division) appeals the decision

of the State of Wyoming, Office of Administrative Hearings (OAH), that Michael W. Parrish's cervical and lumbosacral spine problems are injuries occurring over a substantial period of time and caused by Parrish's heavy lifting at Excal, Inc. Specifically, the Division argues that the decision of OAH is not supported by substantial evidence. Upon our review, we affirm.

## ISSUES

[¶ 2]  The Division presents these issues, with which Parrish does not disagree:

1.  Was the Hearing Examiner's Order Awarding Benefits supported by substantial evidence when the medical evidence establishes that the injury resulted from the Claimant's work history prior to moving to Wyoming and working for Excal?

2.  Did the Hearing Examiner err by failing to consider the evidence that indicated the Claimant developed symptoms following specific events, for which no timely claim was submitted?

## FACTS

[¶ 3]  Parrish has a long career in the foundry industry. In 1976–77, when he was about 18 years old, he was working in a machine factory as a general welder; no heavy lifting was involved. From 1977–90, Parrish worked at Acra–Cast Foundry in Los Angeles, California, where he was a general laborer, lifting up to 40 pounds hundreds to thousands of times a day. From 1979–83, still working at Acra–Cast, Parrish was washing and closing molds by hand. The molds were 15 to 30 inches off the floor and weighed from 25 to 150 pounds each. He performed this work 25 to 100 times a day. Parrish also washed sand and would carry 100–pound sand bags up a flight of stairs to the loader decks. He did this 2 to 3 times a week, lifting each month a total of 50,000 to 70,000 pounds. From 1983–90, still working at Acra–Cast, Parrish acted as the production manager, lifting pattern weights weighing from 50 to 125 pounds and walking with them a distance of about 150 feet. He also used ladle weights, weighing about 40 pounds, to dip aluminum out of the furnace and then walk with them a distance of about 150 feet to the molding line; he did this about 100 times a day for a year consistently. Parrish was further involved in welding large pump casts. This activity required moving by hand on the welding table and in the forklift forks cast weights weighing about 300 to 1000 pounds. He welded 200 pieces in a six-month time period. This work was done in addition to his normal work. From 1990–92, Parrish worked for Anderson Foundry, also in California. His work included heavy lifting; he worked with green sand molds and processed with a shovel about 15,000 to 20,000 pounds of sand a day. He also worked processing parts, lifting weights up to 150 pounds. From 1992 to April 1994, Parrish worked for Farm Bed Manufacturing in Idaho, as a general welder, often lifting up to 150 pounds.

[¶ 4]  Parrish's foundry work caused his body to be sore all over. This soreness spanned from 1977 until the last few years. He had pain and soreness in his arms and back. He knew the pain, stiffness, and soreness was caused by the heavy work in the foundry industry. Parrish did not seek any formal medical treatment with respect to such complaints.

[¶ 5]  In April 1994, Parrish went to work for Excal, Inc., in Casper, Wyoming. From that date to the present, he has been production manager and quality manager and has moved patterns weighing 75 to 100 pounds and has sorted castings weighing up to 30 pounds, from a few to many thousands. In early to mid-December 1994, about eight months after starting work with Excal, Parrish saw Dr. Timothy Johans in Boise, Idaho, upon a referral by Dr. William W. Holyfield. According to Dr. Johans' medical record, Parrish

*was doing reasonably well until four months ago when insidiously he developed severe neck pain and subscapular pain which subsequently over the next week started to radiate all the way down his left arm into the thumb, index, and long fingers. It became increasingly severe, and he developed numbness about two months ago.* He was seen and evaluated initially by Dr. Holyfield who recog-

nized the radiculopathy and ordered an MRI scan which showed a large herniated nucleus pulposes at C6–7 on the left side. Dr. Holyfield recommended an anterior cervical diskectomy, and because the patient has family here in Boise and wanted the surgery done in Boise, Dr. Holyfield referred him to me[.]

(Emphasis added.) Dr. Johans performed the C6–7 diskectomy on December 15, 1994.

[¶ 6] Some years later when Parrish saw Dr. Celia Stenfors–Dacre on February 25, 2002, for an independent medical evaluation, upon a referral from Dr. Robert A. Narotzky, Dr. Stenfors–Dacre asked Parrish about his medical history. Dr. Stenfors–Dacre's report states in pertinent part that Parrish, at the time of the independent medical evaluation, "presents with cervical and lumbosacral back pain." Then, Dr. Stenfors–Dacre's report reads:

> *[Parrish] reports his symptoms began in approximately 1994. Prior to that he had no cervical or lumbosacral back pain, no history of injury to either area.... His symptoms began suddenly....*

(Emphasis added.) During Dr. Stenfors–Dacre's deposition, on September 24, 2002, she was asked if Parrish's 1994 complaints were entirely cervical. She testified:

> [Dr. Stenfors–Dacre]: No, he reported to me he had both cervical and lumbosacral, that it wasn't specifically one more than the other, because I do recall asking him that. And I don't know that I documented that, but he reported that the cervical area under Evaluation [sic] was more painful at the time and that's why it was addressed and then subsequently operated upon.
>
> Q. So as early as 1994 he had symptoms in both the cervical and lumbar spine he reported to you?
>
> A. Yes, that's correct.

Shortly after this testimony, the following exchange occurred (emphasis added):

> [Q.] Now, if he's starting to develop symptoms in 1994, then is it *your opinion that the damage has been done to the structures of that back by the nature of the heavy lifting and the repetitiveness of that lifting by 1994?*
>
> A. *I would agree that would be correct.*
>
> Q. And once this condition—I mean, is this like an injury inside of the back to the structures of the back which starts this process of the back kind of degenerating?
>
> A. Yes, that would be correct. It can involve both the disks between the vertebral bodies as well as the vertebral bodies themselves.
>
> Q. Did it appear to be in his case that most of the degeneration was occurring in the disk structures?
>
> A. Yes, particularly in the—well, actually yes, both in the cervical and lumbosacral region it seemed to be more of a disk issue.
>
> Q. And those disks form the tissues between the hard bony vertebraes, correct?
>
> A. That is correct.
>
> Q. And as we move and age, those disks are subjected to wear and tear; is that correct?
>
> A. That is correct, even without the heavy lifting that does occur.
>
> Q. And in this particular circumstance you believe that the heavy lifting contributed to that wear and tear?
>
> A. I believe it contributed as well as hastened the process of degeneration.
>
> Q. Can you say to a reasonable degree of medical probability that the heavy lifting caused the disk degeneration process to begin?
>
> A. No. *I believe the disk degeneration process begins from the time we're born and go onwards. However, any injury or chronic repetitive activities can hasten or cause this process to occur more rapidly.*

Dr. Stanfors–Dacre formed other opinions as a result of her independent medical evaluation of Parrish (emphasis added):

> A. He seemed to be suffering from both cervical and lumbosacral chronic back pain which seemed to be causing some radiculopathy, meaning that he had some residual weakness and some sensory changes, as I noted previously.

And he has had numerous—according to the medical records, numerous invasive techniques, particularly to the lumbar spine. And he does not seem to be in much improved condition despite all of the interventional work that has been done on him.

You know, he basically is, in my opinion, going to suffer from chronic cervical and low back pain because of all the changes that he has had, both from, you know, the labor side of things as well as from the interventional, which can cause scar tissue and so forth and a change in the bony architecture of the spine, both in the spine and lumbosacral regions.

Q. *Do you come to any conclusions regarding the likely cause of his present back condition?*

A. The conclusion would *most likely be due to the fact of the chronic repetitive heavy work that he had done from the time of 1976 onward, as I noted under the vocational history, and his symptoms would be most consistent with chronic wear and tear to the spine.*

Q. Did you relate his present back condition to any one specific incident?

A. I did not.

Q. Okay. I note your report says that— and I'll quote from it—has a high probability of being directly—excuse me. Let me go back and make sure I get the whole thing.

Mr. Parrish has chronic cervical and lumbosacral back pain which has *a high probability of being directly correlated to his work history of chronic heavy lifting.*

Could you give us the basis for that conclusion, what facts you found that would support that conclusion?

A. This was based upon the radiographic studies, the necessity of cervical surgery, lumbosacral surgery and those types of things. And the findings again are most consistent with chronic wear and tear type patterns of the cervical and lumbosacral spine.

Q. *Is what you found in your examination and in your review of the medical records consistent with the vocational history which he reported?*

A. *It did appear to be.*

[¶ 7] Parrish testified that he did not know if he was doing enough heavy lifting where he was sore at night, when he started working for Excal in 1994. During his employment at Excal, his neck and back would be sore, "but it had been like that for 20 years. It was just normal." In early December 1999, Parrish saw Dr. Robert A. Narotzky, a neurosurgeon, for treatment of his lower back; about this visit, Dr. Narotzky's medical record reveals:

He has had difficulty with this lower back *since 1997.* He has had intermittent low-back pain for which he has taken Toradol on a very infrequent basis. *Beginning two weeks ago,* he had been bending at work and developed severe pain in his left leg with pain that radiated into the anteromedial thigh and medial calf.

(Emphasis added.)

[¶ 8] Parrish denied ever telling Dr. Narotzky that he had been bending at work and developed severe left leg pain that radiated into the thigh and calf. Dr. Narotzky's notation about Parrish's lower back difficulty since 1997 may be placed into context with Parrish having visited Dr. Al Metz in early April 1998. Dr. Metz ordered an MRI of the lumbosacral spine, which was performed on April 7, 1998. The medical record for that MRI reveals a clinical history of "[l]ow back pain with right groin pain for three weeks. Two episodes of pain shooting down to the level of the right heel." The MRI revealed a small to moderate sized right foraminal disk herniation at L2–3. Parrish asked Dr. Metz what may have caused this condition, and Dr. Metz told him he had no idea. When Dr. Narotzky saw Parrish in early December 1999, as mentioned above, he also ordered another MRI. That MRI revealed a far right lateral and foraminal disk herniation at L4–5 *which had progressed from the previous examination and a far left lateral and foraminal disk herniation at L3–4, which was believed to be a new finding from the April 1998 MRI study.* Parrish stopped doing physical labor at Excal in 2000.

[¶ 9] In mid-April 2000, Dr. Narotzky performed a microlumbar diskectomy on Parrish's lower back. Dr. Narotzky's medical records in late April and late June 2000 reveal that Parrish was doing well and had no back or leg pain. Parrish saw Dr. Narotzky in early November 2000 and underwent another MRI. It revealed "some very slight disc bulging toward the right side of the L–4 level." On November 27, 2000, Dr. Narotzky's medical record discloses that Parrish complained of right-sided low back pain, which Dr. Narotzky attributed to the L4–5 disk. Dr. Narotzky's next medical record is dated March 21, 2001, and reports that Parrish had returned to see him. That medical record discloses:

He is getting a drastic significant low-back pain. This is now greater on the left side, although it had been alternating from one side to the other. In November of 2000 he fell on the ice; and since then, he has had increased pain in his low back on the left side with increased pain radiating in the left leg in the anterior thigh to the knee.

When asked at his hearing about this report of a fall on ice, Parrish testified, "I don't believe it ever happened." The MRI report dated March 30, 2001, reveals this clinical history:

42–year–old male with low back pain, eight week history of left leg pain extending into the left groin and medial aspect of left leg, fell on ice 15 November 200[sic].

On April 23, 2001, Dr. Narotzky noted that Parrish had significant disk degeneration at all four levels of the lumbar spine.

[¶ 10] In early 2002, Parrish was seeing Dr. Narotzky for cervical herniations. According to Parrish's appellate brief, those cervical herniations "are not part of [the worker's compensation] claim." Dr. Narotzky did not give Parrish an opinion about whether his work was causing his back problems. Dr. Narotzky recommended that Parrish see Dr. Stenfors–Dacre for an evaluation to find out what may have caused his back problems.

[¶ 11] Following Dr. Narotzky's direction, Parrish prepared a detailed work history, including the heavy lifting he had done, spanning the time from 1976 to 2002. Parrish handed that work history to Dr. Stenfors–Dacre on February 25, 2002, when she examined and evaluated his condition. As a result of that examination and evaluation, Dr. Stenfors–Dacre formed the opinions and conclusions identified above.

[¶ 12] On May 6, 2002, Parrish submitted his injury report to the Division, making a claim against Excal for an injury that occurred over a substantial period of time. Parrish's submission did not refer to any specific injury or any specific date of injury. On May 10, 2002, the Division issued its final determination letter to Parrish informing him that it could not approve payment of benefits. In that letter, the Division also informed Parrish that Excal had objected to Parrish's injury report. The Division also listed several statute-based reasons for its final determination, including "[a]ny injury or condition preexisting at the time of employment with the employer against whom a claim is made." Wyo. Stat. Ann. § 27–14–102(a)(xi)(F). On May 22, 2002, Parrish objected to the Division's final determination and requested a contested case hearing.

[¶ 13] A hearing before the OAH was conducted on October 28, 2002. Both Parrish and the Division presented evidence and argument; Excal did not participate. On November 27, 2002, OAH delivered its decision and entered an order in Parrish's favor. That order set out findings of fact and conclusions of law. Paragraphs two through five of the findings of fact contain many, but not all of the facts which we have recounted above. Paragraphs six and seven of the findings of fact read:

6. Dr. Dacre stated that Parrish had an injury which occurred over a period of time. It is her opinion that: (a) there was a direct causal connection between the injury and Parrish's work of heavy lifting; (b) the injury was a natural result of the employment; (c) the injury can be fairly traced to the employment as a proximate cause; (d) the injury does not come from a hazard to which Parrish would have been equally exposed to outside work; and (e) the injury is incidental to the work and not independent of the work relationship.

7. The evidence establishes that Parrish's cervical and lumbosacral spine problems are not the result of a pre-existing condition, the natural aging process, or from day to day living. The medical evidence, however, establishes that Parrish['s] cervical and lumbosacral spine problems are an injury occurring over time and was caused by his heavy lifting at Excal. Since Parrish has shown that he suffers from an injury which occurred over time, the filing requirements under Wyo. Stat. Ann. § 27–14–502 do not apply. The evidence establishes that Parrish filed within two months of being informed that his injury was work related, and that he has met his burden under Wyo. Stat. Ann. § 27–14–503(b).

Paragraphs four and seven of the conclusions of law read:

4. Dr. Dacre stated that Parrish's cervical and lumbosacral spine problems were most likely be [sic] due to the fact of the chronic repetitive heavy work that he had done from the time of 1976 onward, as I noted under the vocational history, and his symptoms would be most consistent with chronic wear and tear to the spine. It is the opinion of Dr. Dacre that Parrish had a work injury which occurred over a period of time.

. . .

7. Parrish has met his burden and has established he suffered a work injury which occurred over a substantial period of time. The testimony of Dr. Dacre establishes each of the requirements listed in Wyo. Stat. Ann. § 27–14–603(a) (Lexis 2001). As such, Parrish is entitled to benefits.

[¶ 14] On December 23, 2002, the Division filed its petition for review with the district court; subsequently, that court affirmed the hearing examiner's order. The Division timely appealed from that decision.

### *STANDARD OF REVIEW*

[¶ 15] *Robbins v. State ex rel. Workers' Safety and Compensation Div.,* 2003 WY 29, ¶¶ 16–18, 64 P.3d 729, ¶¶ 16–18 (Wyo.2003), identifies, once again, the applicable standard of review:

In a worker's compensation case, the claimant has the burden of proving she suffered a "compensable injury." *Logue v. State ex rel. Wyoming Workers' Safety and Compensation Division,* 2002 WY 62, ¶ 11, 44 P.3d 90, ¶ 11 (Wyo.2002); see also *State ex rel. Wyoming Workers' Compensation Division v. Jacobs,* 924 P.2d 982, 984 (Wyo.1996). To satisfy part of that burden, the claimant must prove the injury occurred in the course and scope of employment. *Logue,* 2002 WY 62, ¶ 11, 44 P.3d 90; *State ex rel. Wyoming Workers' Compensation Division v. Espinoza,* 924 P.2d 979, 981 (Wyo.1996).

Section 27–14–603(a) sets forth the claimant's burden of proving an injury which occurred over a substantial period of time:

(a) The burden of proof in contested cases involving injuries which occur over a substantial period of time is on the employee to prove by competent medical authority that his claim arose out of and in the course of his employment and to prove by a preponderance of evidence that:

(i) There is a direct causal connection between the condition or circumstances under which the work is performed and the injury;

(ii) The injury can be seen to have followed as a natural incident of the work as a result of the employment;

(iii) The injury can fairly be traced to the employment as a proximate cause;

(iv) The injury does not come from a hazard to which employees would have been equally exposed outside of the employment; and

(v) The injury is incidental to the character of the business and not independent of the relation of employer and employee.

This Court recently refined the standard of review for worker's compensation cases in *Newman v. State ex rel. Wyoming Workers' Safety and Compensation Division,* 2002 WY 91, 49 P.3d 163 (Wyo.2002). We held "the substantial evidence test is the appropriate standard of review in appeals from WAPA contested case proceed-

ings when factual findings are involved and both parties submit evidence." 2002 WY 91, ¶ 22, 49 P.3d 163. "Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence." *Jensen*, 2001 WY 51, ¶ 10, 24 P.3d 1133 (citation omitted). In this case, both parties submitted evidence, and the hearing examiner made findings of fact; therefore, this court applies the substantial evidence test to the Division's appeal.

■ [¶ 16] The Division pins its hope for success on appeal on the argument that Parrish's back condition is a preexisting degenerative back condition occurring over a substantial period of time from 1977 to 1994 before his Excal employment and Parrish failed to present any evidence that his current back problems arose from a material aggravation of that preexisting degenerative back condition. Our applicable standard of review in such case was recently expressed in *Salas v. General Chemical*, 2003 WY 79, ¶¶ 10–11, 71 P.3d 708, ¶¶ 10–11 (Wyo.2003):

An "injury" does not include a "condition preexisting at the time of employment with the employer against whom a claim is made." Wyo. Stat. Ann. § 27–14–102(a)(xi)(F) (Michie 1997). The

burden is upon the claimant to prove that his work accident, not his preexisting condition, caused the necessity for the surgery. *Matter of Corman*, 909 P.2d 966, 970 (Wyo.1996); *Matter of Claim of Fortier*, 910 P.2d 1356, 1358 (Wyo.1996). While aggravation of a preexisting condition is a compensable injury, *Matter of Injury to Carpenter*, 736 P.2d 311, 312 (Wyo.1987), claimant must prove that his employment aggravated, accelerated, or combined with the disease or infirmity to produce the disability for which compensation is sought. *Romero v. Davy McKee Corp.*, 854 P.2d 59, 61 (Wyo.1993); *Lindbloom v. Teton Int'l*, 684 P.2d 1388, 1390 (Wyo.1984).

*State ex rel. Wyoming Workers' Compensation Div. v. Roggenbuck*, 938 P.2d 851, 853 (Wyo.1997). "To prove aggravation of a preexisting injury, the claimant must demonstrate that the 'work effort contrib-

uted to a material degree to the ... aggravation ... of the existing condition of the employee.'" *Frazier v. State ex rel. Wyoming Workers' Safety and Compensation Div.*, 997 P.2d 487, 490 (Wyo.2000) (quoting *Lindbloom v. Teton Intern.*, 684 P.2d 1388, 1389–90 (Wyo.1984)) (emphasis omitted).

"The causal connection between an accident or condition at the workplace is satisfied if the medical expert testifies that it is more probable than not that the work contributed in a material fashion to the ... aggravation ... of the injury. We do not invoke a standard of reasonable medical certainty with respect to such causal connection. Testimony by the medical expert to the effect that the injury 'most likely,' 'contributed to,' or 'probably' is the product of the workplace suffices under our established standard....

Under either the 'reasonable medical probability' or 'more probable than not' standard, [a claimant succeeds] in demonstrating the causal connection by a preponderance of the evidence."

*Hall v. State ex rel. Wyoming Workers' Compensation Div.*, 2001 WY 136, ¶ 16, 37 P.3d 373, 378 (Wyo.2001) (quoting *In re Pino*, 996 P.2d 679, 685 (Wyo.2000)).

Whether the employment " 'aggravated, accelerated, or combined with the internal weakness or disease to produce the disability is a question of fact.'" *Brees v. Gulley Enterprises, Inc.*, 6 P.3d 128, 131 (Wyo. 2000) (quoting *Lindbloom*, 684 P.2d at 1390).

Further, although the district court upheld the hearing examiner's determination, this court affords no deference to conclusions reached by the district court; we review the case as if it had come directly from the hearing examiner. *State ex rel. Workers' Compensation Div. v. Brewbaker*, 972 P.2d 962, 964 (Wyo.1999).

### DISCUSSION

[¶ 17] The Division agrees with the finding of fact that Parrish's cervical and lumbosacral spine problems are an injury occurring over a substantial period of time. Indeed,

the Division agrees with Dr. Stenfors–Dacre's opinion that the most likely cause of Parrish's present back condition is "the chronic repetitive heavy work that he had done from the time of 1976 onward" until 1994. However, the Division forcefully asserts "Parrish's back was damaged before he ever came to Excal." The Division supports this assertion with Dr. Stenfors–Dacre's testimony that as early as 1994 Parrish had complaints about, and symptoms in, the lumbosacral spine and Dr. Stenfors–Dacre's opinion that, if Parrish developed such symptoms in 1994, then by 1994 the damage had been done to the structures of Parrish's back by the nature of the repetitive heavy lifting as revealed in Parrish's detailed work history. The Division submits that Parrish failed to present any evidence that his present back problems were caused by a material aggravation of his preexisting degenerative back problem. Thus, the Division contends that the hearing examiner's finding that Parrish's spine problems are not the result of a preexisting condition is not supported by substantial evidence.

[¶ 18] In the alternative, the Division contends that the hearing examiner ignored the medical evidence that Parrish injured his back in two specific incidents, one in 1999 when he bent over and developed severe radiating pain in his left leg, and the other in November 2000 when he fell on ice and thereafter experienced drastic significant low-back pain alternating from side to side with increased pain radiating in the left leg. The Division argues that the hearing examiner's failure to consider such evidence constitutes arbitrary and capricious abuse of discretion.

[¶ 19] On the other hand, Parrish contends that the hearing examiner considered all relevant evidence and concluded that Parrish's long history of working in the heavy labor industry did not preclude the finding of a causal connection between his back condition and his Excal employment. He contends that his spinal pathology worsened during his Excal employment, pointing to the comparison of his 1998 MRI with his 1999 MRI. With regard to the Division's alternative position that Parrish's back condi-

tion may have been caused by a bending incident in 1999 and a fall on ice in November 2000, Parrish claims the hearing examiner considered, but properly rejected, that evidence under the weight of substantial evidence that Parrish's chronic heavy lifting was the cause of his back problems.

[¶ 20] We have carefully examined the entire record to determine if OAH's decision is supported by substantial evidence. We have carefully considered the parties' contentions in light of that record and in light of the applicable law. Based upon that examination and consideration, we hold that OAH's decision should be affirmed.

[¶ 21] Substantial evidence supports the fact that Parrish's degenerative back condition existed before and at the time of Parrish's 1994 employment by Excal. Parrish's own testimony and Dr. Stenfors–Dacre's testimony supports that fact. Parrish's work effort for 16–17 years of chronic repetitive heavy lifting in the foundry industry is well documented. That work effort caused his body to be "sore all over." He had soreness, stiffness, and pain in his arms and back. He told Dr. Stenfors–Dacre that he had symptoms in both the cervical and lumbar spine as early as 1994. According to Parrish, his neck and back were sore during his Excal employment, "but it had been like that for 20 years. It was just normal." Dr. Stenfors–Dacre expressed several significant opinions in this regard: a) As to an individual who has been doing chronic repetitive heavy lifting and hard physical labor from 1977 onward and who starts developing symptoms in 1994, by 1994 the damage has been done to the structures (disks) of that individual's back— the degenerative process is underway. Heavy lifting contributed to and hastened the degeneration process; b) Parrish is going to suffer from chronic cervical and low back pain because of all the changes he has had both from the labor side of things as well as from the surgical interventional side of things which can cause scar tissue and a change in the bony architecture of the spine; c) The most likely cause of Parrish's present back condition is the chronic repetitive heavy work that he had done from the time of 1976 onward; his symptoms would be most consis-

tent with chronic wear and tear to the spine; and d) Parrish's chronic cervical and lumbosacral back pain has a high probability of being directly correlated to his work history of chronic heavy lifting.

[¶ 22] Dr. Stenfors–Dacre's findings are consistent with the vocational history which Parrish reported. Nonetheless, aggravation of a preexisting medical condition is a compensable injury if Parrish could prove that his Excal work effort aggravated his degenerative back condition to produce the current back condition for which he seeks compensation. To prove aggravation of his preexisting medical condition, Parrish must demonstrate that his Excal work effort materially contributed to the aggravation of his existing degenerative back condition. That causal connection is satisfied if his medical expert testifies that it is more probable than not that his Excal work effort contributed in a material fashion to the aggravation of the degenerative back condition. Whether Parrish's Excal work effort contributed in a material fashion to the aggravation of the degenerative back condition is a question of fact. The record contains substantial evidence to prove that fact.

[¶ 23] In this case the record specifically shows that in April 1994, Parrish began employment with Excal, Inc. As a part of this employment at Excal, Inc., Parrish moved patterns weighing 75 to 100 pounds and sorted castings weighing up to 30 pounds. In early to mid-December 1994, about eight months after starting work with Excal, Inc., Parrish went to see Dr. Johans upon referral by Dr. Holyfield. Dr. Johans noted that Parrish was doing reasonably well until four months ago when insidiously he developed severe neck and back pain and subscapular pain which subsequently over the next week started to radiate all the way down his left arm into the thumb, index, and long fingers. This pain then became increasingly severe, and Parrish developed numbness about two months ago. Dr. Johans subsequently performed a C6–7 diskectomy upon Parrish on December 15, 1994.

[¶ 24] In April 1998, Dr. Metz ordered an MRI of Parrish' lumrosacral spine, which revealed a small to moderate sized right foraminal disk herniation at L2–3. At this time, Parrish indicated that he had been experiencing low back pain with right groin pain for three weeks, with two episodes of pain shooting down to the level of the right heel. In early December 1999, Parrish saw Dr. Narotzky. His medical records recounted that Parrish had difficulty with his lower back since 1997 and, two weeks previous to his appointment, Parrish had been bending at work and developed severe pain in his left leg with pain that radiated into the anteromedial thigh and medial calf. Another MRI then revealed a far right lateral and foraminal disk herniation at L4–5 which had progressed from the previous examination and a far left lateral and foraminal disk herniation at L3–4, which was a new finding from the April 1998 MRI study.

[¶ 25] In mid-April 2000, Dr. Narotzky performed a microlumbar diskectomy on Parrish's lower back. In early November 2000, Parrish submitted to another MRI. This testing revealed some slight disk bulging toward the right side of the L4 level. In late November 2000, Parrish complained of right-sided low back pain. Dr. Narotzky attributed this pain to the L4–5 disk. Even as late as February 25, 2002, when Parrish saw Dr. Stenfors–Dacre, not for treatment purposes but for an independent medical evaluation, she indicated in her records that Parrish reported his symptoms to begin in approximately 1994; prior to that Parrish had no cervical or lumbosacral back pain, with no history to either area, and his symptoms then began suddenly. In fact, Parrish reported to Dr. Stenfors–Dacre that prior to that date he had no specific back symptoms and no history of injury to his back, either at work or elsewhere.

[¶ 26] There is no dispute that Parrish's back began to degenerate before he began employment with Excal, Inc. Dr. Stenfors–Dacre unequivocally stated that back degeneration begins upon birth, and Parrish performed repetitive heavy lifting in the foundry industry beginning in 1976 that would have hastened the degenerative process. However, she further indicated that any injury would likewise hasten or cause the disk degeneration process. While Parrish had prior

soreness, stiffness, and some pain in his arms and back, the record establishes that Parrish did not experience severe enough pain in the cervical and lumbar spine to seek medical assistance until November 1994, approximately eight months after he had been employed by Excal, Inc. Subsequently, Parrish continued to experience severe back problems when he remained employed at Excal, Inc.

[¶ 27] Dr. Stenfors–Dacre further opined that the most likely cause of Parrish's present back condition was chronic repetitive heavy work that he had done since 1976 and that Parrish's chronic cervical and lumbosacral back pain had a high probability of being directly correlated to his work history of chronic heavy lifting. Of course, this time frame would include the time that Parrish worked at Excal, Inc. from 1994 forward.

> Preexisting disease or infirmity of the employee does not disqualify a claim under the "arising out of employment" requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought.

*Hepp v. State ex rel. Workers' Compensation Div.,* 881 P.2d 1076, 1079 (Wyo.1994) (quoting 1 Arthur Larson, The Law of Workmen's Compensation, § 12.21 (1996)); see also *Jim's Water Serv. v. Eayrs,* 590 P.2d 1346, 1349 (Wyo.1979).

*State ex rel. Worker's Compensation Div. v. Roggenbuck,* 938 P.2d 851, 854 (Wyo.1997) (Hartman, D.J., dissenting). We conclude, therefore, that substantial evidence was produced at the hearing to support a determination that Parrish's Excal, Inc. work effort actually caused his back injuries, or at least contributed in a material degree to the aggravation of his preexisting degenerative back condition.

[¶ 28] Finally, Parrish cannot be faulted for not properly fashioning his case so that it was possible to reach a conclusion that Parr-

ish's Excal. Inc. work effort materially contributed to the aggravation of his preexisting degenerative back condition. To the contrary, Parrish's injury report stated that his injuries had occurred over a substantial period of time while he was at Excal, Inc. without any reference to any specific date of injury. He thereafter consistently asserted this position. We see little difference in Parrish's position and a contention that he had a preexisting back degenerative condition and that as a result of his employment at Excal, Inc., such effort caused his substantive back injuries and/or materially contributed to the aggravation of his preexisting degenerative back condition.[1]

[¶ 29] It is well established in Wyoming that:

> An employee-claimant in a worker's compensation case has the burden to prove all the statutory elements which comprise a compensable injury by a preponderance of the evidence. *Hanks v. City of Casper,* 2001 WY 4, ¶ 6, 16 P.3d 710, ¶ 6 (Wyo. 2001); *Sherwin–Williams Company v. Borchert,* 994 P.2d 959, 963 (Wyo.2000); *Thornberg v. State ex rel. Wyoming Workers' Compensation Division,* 913 P.2d 863, 866 (Wyo.1996). This includes establishing the cause of the condition for which compensation is claimed and proving that the injury arose out of and in the course of employment. *Wesaw v. Quality Maintenance,* 2001 WY 17, ¶ 10, 19 P.3d 500, ¶ 10 (Wyo.2001); *Hanks,* ¶ 6; *State ex rel. Wyoming Workers' Compensation Division v. Espinoza,* 924 P.2d 979, 981 (Wyo.1996). Put another way, the claimant has the burden of following procedures and rules contained within the Wyoming Worker's Compensation Act in order to establish entitlement to worker's compensation benefits. *Sherwin–Williams Company,* 994 P.2d at 963; *Pittman v. State ex rel. Wyoming Workers' Compensation Division,* 917 P.2d 614, 617 (Wyo.1996).

---

1. Given Dr. Stenfors–Dacre's position that back degeneration begins in everyone immediately upon birth, virtually anybody asserting a degenerative back-related claim under Wyoming's workers' compensation system is, in essence, contending that their work responsibilities either directly caused the involved substantive back injury or injuries or materially contributed to the aggravation of the preexisting degenerative back condition.

To meet the preponderance standard, the claimant must present evidence which leads the trier of fact to find that the existence of the contested fact is more probable than its non-existence. *Sherwin–Williams Company*, 994 P.2d at 963.

*Bruns v. TW Services, Inc.*, 2001 WY 127, ¶¶ 12–13, 36 P.3d 608, ¶¶ 12–13 (Wyo.2001). We have equally well established that upon our review of the entire record, if the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. *Ludwig v. State ex rel. Workers' Safety and Compensation Div.*, 2004 WY 34, ¶ 6, 86 P.3d 875, ¶ 6 (Wyo.2004).

[¶ 30] Moreover, even if a conclusion can be reached that the OAH improperly found that Parrish's injuries were caused solely by his Excal, Inc. work over a substantial period of time, sufficient evidence was presented to prove that Parrish's employment at Excal, Inc. actually either caused his back injuries, or at least contributed to a material degree to the aggravation of his preexisting degenerative back condition. Finally, for the same reasons noted above, we conclude that the bending incident in 1999 and Parrish's fall on the ice in November 2000 were considered by OAH, yet the OAH properly rejected such evidence as having a causal connection to Parrish's work-related injuries.

## CONCLUSION

[¶ 31] Upon careful examination of the entire record, we hold that OAH's decision is supported by substantial evidence. Affirmed.

GOLDEN, J., filed a dissenting opinion in which VOIGT, J., joined.

GOLDEN, J., dissenting.

[¶ 32] I respectfully dissent. Parrish pursued his claim under Wyo. Stat. Ann. § 27–14–603(a), contending that his degenerative lumbosacral "injury" occurred over a substantial period of time and arose out of and in the course of his Excal employment. The Division opposed his claim, contending, among other things, that Parrish's degenera-tive lumbosacral "injury" was a "condition preexisting at the time of employment with [Excal]" and, therefore, did not satisfy the definition of "injury" under the Workers' Compensation Act. Wyo. Stat. Ann. § 27–14–102(a)(xi)(F) (LexisNexis 2003).

[¶ 33] Parrish's report of injury and its attachment made no mention of a preexisting condition claim; Parrish's contested case disclosure statement made no mention of a preexisting condition claim. Neither Parrish's opening statement nor his closing argument at the contested case hearing expressed a preexisting condition claim. Importantly, the hearing examiner's decision is clearly not an "aggravation-of-preexisting condition" decision. Importantly, Dr. Stenfors–Dacre did not express any opinion that Parrish's work effort in the six years of Excal employment, in contrast to the previous sixteen plus years of chronic repetitive heavy lifting and hard physical labor for other employers, contributed in a material fashion to the aggravation of Parrish's degenerative back condition. The record is pregnant with evidence that Parrish's degenerative lumbosacral "injury" preexisted Parrish's Excal employment.

[¶ 34] The majority opinion states that it sees "little difference" in Parrish's contested case position that his "injury" had occurred over a substantial period of time while employed by Excal and a contention that his Excal work materially contributed to the aggravation of his preexisting "injury." The "difference" is much more than "little." It has to do with Parrish's burden of proof. He must prove that his Excal work contributed to a material degree to the aggravation of his preexisting degenerative lumbosacral condition. That is the determinative fact in this case and, on this record, Parrish failed to produce substantial evidence of that determinative fact. Tellingly, Dr. Stenfors–Dacre, upon whom Parrish relies, did not express any opinion that Parrish's six years' work at Excal contributed in a material fashion to the aggravation of Parrish's preexisting degenerative lumbosacral condition.

[¶ 35] I think the majority has impermissibly both reframed the issue on which Parrish went to hearing and rewritten the hearing examiner's decision. I would reverse the

hearing examiner's decision because it is not supported by substantial evidence.